(C. D. 759)

FIRESTONE TIRE & RUBBER CO. *v.* UNITED STATES

## United States Customs Court, First Division

(Decided April 17, 1943)

*Barnes, Richardson & Colburn (J. Bradley Colburn* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Robert C. O'Grady* and *Richard E. Fitz Gibbon,* special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: Firestone Tire & Rubber Co. imported at the port of Cleveland, Ohio, from Eldorado Gold Mines Ltd. of Port Hope, Ontario, a shipment invoiced as "Radioactive Lead Oxide." Duty was levied thereon at the rate of 30 per centum ad valorem under paragraph 46 of the Tariff Act of 1930 (19 U. S. C. 1940 ed., § 1001, par. 46), as a lead compound, not specially provided for. Plaintiff protested the assessment, making various claims under provisions of different paragraphs of the said tariff act.

The record consists of the uncontradicted testimony of two well-qualified witnesses, employed in research departments of the plaintiff-corporation, whose duties include the development of new, as well as the improvement of old, products used by that concern in its manufacture of automotive accessories. One, Dr. John H. Dillon, is head of the research physics division. He developed commercial usage for the product obtained from the imported merchandise, and holds a number of United States patents covering such usage. The other, Dr. John H. Street, is director of chemical and physical research. He is responsible for the importation in question, having located at the exporting company a source for the desired material.

The merchandise involved is a residue from Alaskan ore, processed at the refinery of the Canadian exporter where uranium, silver, and radium-barium, are recovered. The remaining material, consisting of approximately 96 per centum lead, 1 per centum radium D, and 3 per centum other impurities, none of which exceeds 1 per centum in quantity, constitutes the imported commodity. To facilitate its transportation, the solids were precipitated from the liquid and shipment was made in 50-pound cloth bags, packed in wooden boxes.

The merchandise arrived in this country in the form of an oxide although its use as a lead oxide is prohibitive because of the radio-active element contained in the radium D.

Eight years of study and research for radioactive material to be used in electrode wire employed in the manufacture of spark plugs by plaintiff terminated in the decision to use the imported product. Dr. Dillon discovered the value of radium D for obtaining desired results whereupon contact was made with the largest radium refinery, the

exporter of the instant merchandise, which heretofore was being discarded as apparently having no value.

Its imported condition represents the only known commercial form of radium D. It is never found alone but always associated with lead. It appears with its combined metal in minute quantity, but is extremely active and effective. Radium D is a member of the so-called radium-disintegrating-series, of which radium is the ultimate parent. By reason of its radioactive properties, radium and all its elements possess the unusual characteristic of changing into lower members through a constant, natural, process of degradation. Hence, over a given interval of time, radium evolves or disintegrates into radon. The latter, an inert gas also possessing radioactive qualities, disintegrates over a definite unit of time into a substance known as radium A. Through the same process, the new substance becomes the parent of the following one, known as radium B. Plaintiff's witness described the process as follows (r. 19):

That is just one of nature's processes. We can't do anything about it. If you start out with the first member of the series within a reasonable time you have got all the members of the series in that one group. In other words, the first one is making the second; the second is making the third, the fourth, the fifth, down the line. That goes on in such a way that you never use up the first one. It builds up the whole family of materials under it. If we buy Radium D within a certain length of time we also have mixed with it Radium E and F.

Radium D is the imported commodity, but it is the radioactive element emanating therefrom, the most important of its chemical or physical properties, known as Radium F or polonium, which is the desired product. Polonium, like radium, is strong in alpha radiation and comparatively weak in beta and gamma rays, the three types of radiation emitted by radioactive bodies. The use of radium, however, is not feasible for plaintiff's purpose, not only from an economical viewpoint but also because of its faculty to produce Radium C, that emits strong gamma rays having great therapeutic value, for which radium is chiefly used. The interest of plaintiff in alpha rays was explained as follows:

Now, the alpha radiation is what is known as an ionizing ray. It has strong ionizing power compared to either the beta or gamma, and it is the alpha ray that we wanted, because the efficiency of a spark gap depends on the ease of causing a spark to jump across. That is facilitated by what we call ionization of the gas. In other words, the resistance of the gas to the passage of the electric current is much reduced if the gas is ionized. Consequently if we have alpha. rays in that spark gap, because of ionization at that point we therefore facilitate the operation of that spark gap under any given electrical condition; and that. is the effect we desired and that is the effect we produce.

Polonium, for which plaintiff acquired practical use, is made available by converting the imported material to solution by treatment with hydrochloric acid, thereby releasing the ions of polonium

which are plated off on nickel foils. The latter are bundled in stick-like form and ultimately plunged in a nickel melt used to manufacture electrode wire for spark plugs. The polonium distributes itself uniformly, having the effect of dispersing its radioactive properties throughout the molten nickel melt. The alpha radiation imparted by the polonium is 4,500 times stronger than that possessed by pure radium.

Radium D, however, produces polonium only to the extent of 3 per centum of its quantity over a year's time, so, after the polonium has been plated off, there still remains in solution approximately 97 per centum of the imported commodity. Since the product continues to retain the characteristic of working or disintegrating into radium F, it is precipitated by cooling the tanks and then stored in ceramic containers for a definite period, at the conclusion of which it is subjected to the treatment for recovery of the polonium.

The principal claim of plaintiff is that the merchandise is entitled to free entry under paragraph 1749 of the Tariff Act of 1930 (19 U. S. C. 1940 ed., § 1201, par. 1749), which provides for "Radium, and salts of, and radioactive substitutes."

Prototype provisions were enacted in paragraphs 1650 of the Tariff Act of 1922 and 585 of the Tariff Act of 1913, the language being an extension of the *eo nomine* provision for "Radium," which first appeared in paragraph 659 of the Tariff Act of 1909.

The earliest judicial interpretation of the term is found in the case of *E. Stegemann, Jr. v. United States*, 26 Treas. Dec. 16, T. D. 34052, which held certain merchandise invoiced as "Radiogen-Trinkwasser," consisting of "radioactive water and bandages impregnated with a radioactive solution, used for medicinal purposes," to be free of duty under paragraph 659 of the Tariff Act of 1909. The decision was followed in the cases of *Morgenstern & Co. v. United States*, 27 Treas. Dec. 346, T. D. 34863, and *Carl Machel v. United States*, 61 Treas. Dec. 1548, Abstract 19539, which arose under the Tariff Acts of 1913 and 1922, respectively. In reaching its conclusion in the *Stegemann* case, *supra*, this court, speaking through the late Judge Brown, said:

When the Congress inserted in the act of 1909 the provisions of the free list, using simply the word "radium" it must have meant to include more than the pure metal. According to the testimony in this case, radium does not occur in nature as the uncombined metal, and is not marketed for use as a medicine in that form, but only in the form of its various salts, either dissolved in water, as in this case, or mixed with some solid container. To hold in these circumstances that Congress meant only to admit free the pure metal radium, uncombined, would, in our opinion, render the provision in the free list meaningless.

Knowledge of that and subsequent decisions is imputed to Congress, *United States v. Post Fish Co.*, 13 Ct. Cust. Appls. 155, T. D. 41022, and when, in the subsequent tariff acts, the *eo nomine* designation was

substituted with language that definitely extended the scope of the original provision for radium, it carried the effect of legislative sanction of the broad interpretation announced in the *Stegemann* case, *supra*. To give expression to such approval requires application of the well-known rule that statutes are made for the future as well as for the present, *Chicago Mica Co. et al. v. United States*, 21 C. C. P. A. 401, T. D. 46927, because the commodity in question was not discovered and developed commercially until after the Tariff Act of 1930 was enacted. In so doing, we attribute to Congress a recognition of the potentialities of radium and its allied elements, whose peculiar properties offer increasingly great possibilities in scientific and industrial fields. Assuming such to be true, subsequent developments with most interesting and incalculably valuable results, have fully justified such Congressional vision.

. Since 1890, when the French scientist, Becquerel, in association with Madame Curie, isolated from a great mass of uranium ore a few crystals of a strange substance which became known as radium, physicists and chemists have worked hand-in-hand discovering, by hard work and genius, products with properties inherent to radium, such as the commodity radium D, the merchandise in question. Its practical application by plaintiff is comparatively recent. The three kinds of radiation—alpha, beta, and gamma—common to radium also emanate from radium D. Its true value lies in the radioactive element in the form of polonium which it naturally produces, and its use in promoting, as it does, efficient operation of spark plugs is vitally important in a most progressive field.

That Congress intended to give to industry and science the benefits derived from the use of such a rare substance, seems to be a fair conclusion. To effectuate such intention requires a liberal construction of the language of paragraph 1749, *supra*, sufficiently broad in scope to include the radium D in question, whose radioactive qualities give to it the prominence applicable to radium itself. Accordingly, it is held to be entitled to free entry under the provisions of said paragraph 1749, as claimed.

In view of this conclusion, it is unnecessary to discuss the other claims alleged by plaintiff, to wit: that the merchandise is free of duty as a metallic mineral substance in a crude state under paragraph 1664; or dutiable, either at 7½ per centum ad valorem as waste, not specially provided for, under paragraph 1555, as amended by trade agreements with Canada and the United Kingdom, published in T. D. 49752 and T. D. 49753, or 10 per centum ad valorem under paragraph 1558, as an unenumerated unmanufactured article.

The protest is sustained and the decision of the collector *reversed.* Judgment will be rendered accordingly.